MJHI 917116

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF OLMSTEAD                              THIRD JUDICIAL DISTRICT
                                                    Court File No.: _____

Deanne Kundert,

                    Plaintiff,                              **SUMMONS**

vs.

Mayo Clinic,

                    Defendant.

TO THE ABOVE-NAMED DEFENDANT:

1.      **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you.
The Plaintiff's Complaint against you is attached to this Summons. Do not throw these papers
away. They are official papers that affect your rights. You must respond to this lawsuit even
though it may not yet be filed with the Court and there may be no court file number on this
Summons.

2.      **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS.** You
must give or mail to the person who signed this summons **a written response** called an Answer
within 20 days of the date on which you received this Summons. You must send a copy of your
Answer to the person who signed this Summons located at:

            Daniel Gray Leland, Esq.
            LELAND LAW PLLC
            310 Fourth Avenue South
            Suite 5010
            Minneapolis, MN  55415

3.      **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written
response to the Plaintiff's Complaint. In your Answer you must state whether you agree or
disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given
everything asked for in the Complaint, you must say so in your Answer.

4.      **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN
RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.**
If you do not answer within 20 days, you will lose this case. You will not get to tell your side of the
story, and the Court may decide against you and award the Plaintiff everything asked for in the
Complaint. If you do not want to contest the claims stated in the Complaint. A default judgment
can be entered against you for the relief requested in the Complaint.

5.      **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do
not have a lawyer, the Court Administrator may have information about places where you can get
legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to**



EXHIBIT
A

**protect your rights or you may lose the case.**

      6.     **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated this <u>1st</u> day of September 2016.          **LELAND LAW PLLC**

                                     <u>/s/ Daniel Gray Leland</u>
                                     Daniel Gray Leland, #389027
                                     310 Fourth Avenue South, Suite 5010
                                     Minneapolis, MN 55415
                                     T/F: 612-206-3780
                                     Email: leland@lelandlawoffice.com

STATE OF MINNESOTA

COUNTY OF OLMSTEAD

DISTRICT COURT

THIRD JUDICIAL DISTRICT

Court File No.: _____

Deanne Kundert,

                Plaintiff,

vs.

Mayo Clinic,

                Defendant.

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

---

The Plaintiff Deanne Kundert for her Complaint against Defendant, states and alleges as follows:

## PARTIES

1.    Plaintiff Deanne Kundert is a natural person residing in the County of Goodhue, State of Minnesota.

2.    At all times relevant hereto, Mayo Clinic was a Minnesota non-profit corporation licensed and doing business in the State of Minnesota, and doing business in the County of Olmstead, State of Minnesota.

3.    At all times relevant hereto, Plaintiff and Defendant were "employee" and "employer," respectively, within the meaning of Minnesota Statutes § 363A.03.

4.    At all times relevant hereto, Plaintiff and Defendant were "employee" and "employer," respectively, within the meaning of Minnesota Statutes § 181.931.

5.    At all times relevant hereto, Plaintiff and Defendant were "employee" and "employer," respectively, within the meaning of Minnesota Statutes § 176.011.

6.    At the time of her termination, Plaintiff was 52 years of age.

7. At all time relevant hereto, Plaintiff was employed by Defendant at Defendant's facilities in the County of Olmstead, State of Minnesota.

8. The acts alleged in this Complaint arise under the statutes of Minnesota and fall within the general subject matter jurisdiction of this Court.

## FACTS

9. Plaintiff began working for Defendant in or around April 1984.

10. For the last sixteen (16) years of her employment, Plaintiff was employed by Defendant as a "supply assistant" for Defendant's clinical dermatology unit.

11. In or around approximately 2007/2008, Steve Berres ("Berres") became the supervisor of the clinical dermatology unit.

12. During her tenure as Defendant's supply assistant in the clinical dermatology unit, Plaintiff received positive performance reviews, was lauded by supervisors, doctors, and nursing staff, and served as an integral member of the unit.

13. As a supply assistant, Plaintiff was responsible for ordering supplies and medications, insuring that patient rooms had proper supplies, checking and removing expired supplies and medications, cleaning patient rooms, assisting patients, and performing administrative work.

14. Beginning in or around Spring 2014, Berres began to exhibit increasingly inappropriate workplace behavior and increasingly discriminatory workplace behaviors. To wit:

    a. Berres referred to a former nurse in the clinical dermatology unit as "Fatty Patty."

    b. Berres stated that he was glad that the employee identified in paragraph 14(a) was no longer employed in the department and would refer to her as a "bitch."

2

c. Berres routinely commented that he would not hire nursing applicants for the department who were "old," "fat," or "ugly."

d. Berres would call employees into his office to show them photographs of the staff that he wanted to hire. Consistent with Berres' statement in paragraph 14(c) it appeared that he was deliberately choosing applicants that were not "old," "fat," or "ugly."

e. Berres also called a male nurse to inquire whether a nurse applicant was "hot" (i.e. physically attractive) enough to hire.

f. Berres made comments that a female nurse was joking with another nurse that she was hoping she was "no longer on her period because she [had] a big date."

g. Berres commented that a female nurse was late to work, asking, "Did you have trouble getting him off you?"

15. In or around February 2015, a former employee of Defendant made an administrative appeal of her termination to Defendant, based on Defendant's policies and procedures.

16. Plaintiff was asked to meet with Defendant's internal "Appeals Committee" to discuss her knowledge about the former employee's employment and termination.

17. Prior to Plaintiff's meeting with the "Appeals Committee," Berres met with Plaintiff to "coach" her about what she should tell the Appeals Committee. Specifically:

a. Berres told Plaintiff that she was going to be "drilled" about him by the Appeals Committee and that he wanted to coach her about what to say;

b. Berres told Plaintiff "When you talk to HR [human resources] and they ask about me, remember if you have my back I have yours;"

      c.   Berres told Plaintiff that if the interviewees talked about his behavior and conduct at work he could lose his job and that he would "take [them] with [him];"

      d.   Berres further told Plaintiff that she was required to page him immediately after her meeting with the Appeals Committee.

18.    Plaintiff responded to Berres by stating that she knew what she was going to tell the Appeals Committee and would not tell him what she was intending on disclosing.

19.    Berres became immediately visibly upset.

20.    Similarly, Plaintiff spoke with other co-workers who indicated they felt pressured by Berres to provide detrimental information about the appealing employee.

21.    Plaintiff spoke with other co-workers who indicated they were told by Berres to not state anything about Berres' inappropriate and discriminatory behavior in the workplace.

22.    Berres told employees that were to meet with the Appeals Committee they should not talk about him, or "the shit [would] hit the fan."

23.    On or around February 25, 2015, Plaintiff spoke with a female nurse in the clinical dermatology unit, who was a subordinate of Berres.

24.    That nurse explained to Plaintiff that she wanted to leave the clinical dermatology unit.

25.    The nurse further explained that the reason why she wanted to leave the clinical dermatology unit was because Berres was going "too far" with his sexual comments toward her and "pushing the limits" with what he was doing sexually toward her. At the time, the nurse appeared to be attempting to not cry.

26.    Based on the nurse's comments that she was intending on leaving the clinical dermatology unit because of Berres' sexual comments and behavior toward her, as well as

4

Berres' other inappropriate and discriminatory actions and comments, Plaintiff called and met Julie Hass ("Hass"), Defendant's Operations Supervisor of Dermatology.

27. During her meeting with Hass, Plaintiff reported a number of specific instances of Berres' inappropriate workplace conduct.

28. Plaintiff reported to Hass that a nurse was intending on leaving the unit because of Berres' sexual comments and behavior.

29. Plaintiff further reported to Hass that Berres hired and bragged about hiring women based on their physical looks and size.

30. Plaintiff reported to Hass that Berres had stated that he wanted to make a "pin-up" style calendar of the nurses. Plaintiff reported that Berres told one nurse that she could be on the calendar if she straightened her hair.

31. Plaintiff reported the comments identified in paragraph 14(f) and 14(g).

32. Plaintiff and Hass made an appointment to meet on March 3, 2015, to follow-up on Plaintiff's concerns and reports in further detail.

33. On February 27, 2015, Plaintiff received an email from Patricia Jensen ("Jensen"), Defendant's Nurse Administrator Hematology/Oncology/BMT/Dermatology Division, and Berres' supervisor.

34. Jensen's email urgently requested that Plaintiff meet with her.

35. Plaintiff and Jensen met on March 1, 2015.

36. Plaintiff reported to Jensen that Berres made sexual comments in the workplace, and that Berres would instigate "dirty talk" with other employees.

37. Jensen warned Plaintiff that she "could be fired." Jensen reiterated on multiple occasions that Plaintiff could "lose [her] job."

38.     Jensen further criticized Plaintiff's roles and duties on the work floor: specifically whether or not her position was necessary.

39.     Based on Jensen's threats, Plaintiff reported to Hass and Jensen that she was unwilling to further meet with Jensen.

40.     In March 2015, nursing staff in Defendant's dermatology unit were told that Defendant was conducting individual meetings with employees to examine issues within the department and the functioning of the department.

41.     These meetings were referred to as "teamwork/respectful environment discussions."

42.     Staff and nurses were told that Berres would not be present for two weeks while the "teamwork/respectful environment discussions" took place.

43.     Despite the same, Berres appeared in the clinical dermatology unit even though he was not working.

44.     Berres observed which employees were meeting with Peter Taddy ("Taddy") and Anna O'Rourke ("O'Rourke"), employees in Defendant's human resources department who were conducting the "teamwork/respectful environment discussions."

45.     Upon information and belief, Berres appeared in the department while on leave during these "teamwork/respectful environment discussions" with the intent and purpose of "chilling" employees from discussing Berres' discriminatory, retaliatory and otherwise inappropriate workplace conduct.

46.     Similarly, when Berres came to the floor during these two weeks, he would purposefully ignore Plaintiff.

47.     Nursing and other staff were told that conclusions and recommendations from the "teamwork/respectful environment discussions" would be shared with staff after the conclusion of the meetings.

48.     The conclusions and recommendations from the "teamwork/respectful environment discussions" were never shared with Defendant's staff in the clinical dermatology unit.

49.     On or around March 20, 2015, Plaintiff met with Hass. Plaintiff was asked to explain what exactly she "did" in the department.

50.     By March 23, 2015, Plaintiff was asked to provide a list of her "daily routines" "as soon as possible."

51.     By March 25, 2015, Plaintiff was told that her position was being "reviewed."

52.     Plaintiff was told that the "supply assistant" position was important and that Plaintiff should cross-train on duties with the dermatology department's other supply assistant.

53.     Plaintiff was also specifically told that nurses "were to function as nurses" and that supply assistants should not rely upon nurses or the nurse supervisor for assistance.

54.     Thereafter, Plaintiff worked with Dorene Lyke ("Lyke"), the other supply assistant in Defendant's dermatology unit to cross-train on duties.

55.     Upon Plaintiff's best information and belief, at the time Lyke was approximately 62 years-old.

56.     Plaintiff applied and was approved for federal Family and Medical Leave Act ("FMLA") leave from on or around March 23, 2015. Plaintiff returned to work on a part-time schedule on or around April 13, 2015.

57.    Plaintiff's FMLA leave was, at least in part, for work-related stress, depression, and anxiety.

58.    Defendant and Berres were aware that Plaintiff's FMLA leave was for work-related stress, depression, and anxiety.

59.    While on FMLA leave, Plaintiff learned from nurses in the dermatology unit that Berres was spreading lies about Plaintiff and gossiping that Plaintiff was spreading disinformation about Berres.  For example, Berres told nurses in the unit that Plaintiff had called his wife and claimed he was having a romantic affair with a nurse.

60.    Plaintiff documented this in a formal email complaint to Taddy on or around April 6, 2015.

61.    By mid-April 2015, immediately after Plaintiff's return from continuous FMLA leave, many of Plaintiff's job duties and responsibilities were stripped away from her.

62.    For example, Plaintiff was no longer provided a desk at which to work.

63.    Additionally, Plaintiff was no longer provided access to voicemail.

64.    Plaintiff was told that she was no longer responsible for ordering supplies.

65.    While Plaintiff was being stripped of her regular duties and responsibilities, the other supply assistant in the dermatology unit's duties remained the same, and involved ordering supplies, stocking rooms, making supply kits, and assisting nurses and physicians.

66.    Despite removing many of her duties and responsibilities, Berres refused to discuss Plaintiff's duties and responsibilities with her, or the changes that had been made to her position.

67.     By email dated April 15, 2015, Plaintiff advised Taddy, carbon-copying Hass, that she had heard that Berres was planning to eliminate her position for "retaliation purposes or payback."

68.     Plaintiff further requested "direction" about the changes to her duties and responsibilities since her return from FMLA leave.

69.     Taddy made no inquiry why Plaintiff was being subject to retaliation.

70.     Plaintiff applied and was approved for intermittent FMLA leave on or around April 19, 2011 for work-related stress, depression and anxiety.

71.     Defendant and Berres were aware that Plaintiff was on FMLA leave for work-related stress, depression, and anxiety.

72.     Plaintiff's FMLA leave ended on June 8, 2015.

73.     Berres ignored Plaintiff when she emailed or asked him questions. This included questions about her job duties, time card coding, and online training.

74.     On or around May 6, 2015, Plaintiff observed a loud and angry confrontation between Berres and an employee in Defendant's dermatology unit.

75.     The intensity and anger of the conversation made Plaintiff visibly upset and in tears.

76.     Berres took Plaintiff into his office and stated that she should not be at work because she was visibly upset.

77.     Berres told Plaintiff that she should take the remainder of the day and the next day off from work and that he would designate those days as "FMLA days."

78.     Despite Berres telling Plaintiff that he would designate Plaintiff's time off on May 6 and May 7, 2015, as FMLA qualifying, he refused to do so.

79.     Plaintiff's use of FMLA leave was used as a factor in issuing Plaintiff "Corrective Actions" for attendance matters.

80.     On May 11, 2015, Plaintiff met with Taddy and O'Rourke. Plaintiff reported that Berres had stated that he would designate Plaintiff's absences on May 6 and May 7, 2015, as "FMLA days" but had failed to do so.

81.     On or around May 14, 2015, Plaintiff's wrote O'Rourke discussing the "retaliation issues with the appeals and with the appeals all together . . . ."

82.     By May 2015, Berres' hostility toward Plaintiff was open, obvious, and observed by others.

83.     On or around May 18, 2015, Plaintiff wrote O'Rourke and discussed retaliation for her participation in the appeals hearing.

84.     By the end of May 2015, Defendant's human resources department was again having meetings with nursing staff about matters regarding Berres and his inappropriate workplace conduct.

85.     On June 9, 2015, Plaintiff was issued a "Corrective Action." The Corrective Action disciplined Plaintiff for not following a "chain of command," and instead providing information directly to Defendant's Human Resources department.

86.     At Defendant, a corrective action may impact an employee's eligibility for an annual salary adjustment.

87.     This "Corrective Action" disciplined Plaintiff for her work absences. Included in this count was Plaintiff's absence on May 7, 2015, which Berres had indicated would be designated as a "FMLA day."

88.     Plaintiff was told by O'Rourke, that if Berres failed to address her questions or concerns in a timely matter, that she should then address the matter with human resources.

89.     Despite this instruction, Plaintiff was routinely told that addressing matters directly with Defendant's Human Resources Department was inappropriate and subject to disciplinary action.

90.     On June 23, 2015, Plaintiff was provided an updated Supply Assistant job description.

91.     On or around June 29, 2015, Defendant requested that Plaintiff attend a fitness-for-duty examination.

92.     Defendant regarded Plaintiff as disabled, as evidenced by its demand that she submit to a fitness-for-duty examination, and had a record of a disability based on her use of FMLA leave and the reasons for that leave.

93.     Taddy told Plaintiff that the fitness-for-duty examination was "simply being recommended to ensure that you are receiving all the support you need to be successful."

94.     On or around June 30, 2015, Plaintiff was issued a performance review. Plaintiff's review was to be completed by on or around February 15, 2015, nearly five months prior.

95.     As part of her review, Plaintiff was told that she was not supposed to laugh on the nursing floor, that she was not to walk down a specific hallway, and that she was not supposed to use a specific bathroom. Plaintiff was further told that she would no longer be provided a desk or work space to perform her administrative work, but instead was required to complete her paperwork in the employee break room. These numerous restrictions affected Plaintiff's ability to perform her work.

96.     After her review, Plaintiff wrote that "bull[y]ing, retaliation and payback are all parts on my review and my missed time and will comment in full when all is final and that is ok."

97.     On or around July 5, 2015, Plaintiff sent an email and packet of information to O'Rourke regarding Berres' discriminatory behavior and inappropriate workplace conduct.

98.     In July 2015, Plaintiff was issued two corrective action conference forms.

99.     Plaintiff was issued these corrective action conference forms for reporting matters relating to Berres' inappropriate, discriminatory, and retaliatory behavior.

100.    For example, Plaintiff was issued a corrective action conference form because she sent an email to O'Rourke detailing her concerns and fear of Berres, and provided a number of written documents in paper form.

101.    Plaintiff also requested the opportunity to discuss these matters with O'Rourke, but was never provided the opportunity.

102.    In or around October 7, 2015, Berres instructed Plaintiff to use broken and unsafe liquid nitrogen equipment.

103.    It was Plaintiff's duty and responsibility to fill containers of liquid nitrogen on a daily basis.

104.    Liquid nitrogen can cause severe frostbite or eye damage upon contact.

105.    Defendant's employees in the Clinical Dermatology Unit were not provided appropriate "Personal Protective Equipment" for handling liquid nitrogen.

106.    Plaintiff was injured after using Defendant's unsafe and broken liquid nitrogen equipment.

107.    Plaintiff reported to Berres that she she had been injured by liquid nitrogen.

108. Berres refused to make a a first report of injury, and told Plaintiff that she need not fill out an incident report.

109. Due to Berres' refusal, Plaintiff submitted a safety report about her injury directly to Defendant.

110. Less than 2 weeks prior to receiving notice of her termination, Berres walked into the triage unit agitated and extremely angry.

111. Berres stated, "That fucking Deanne turned me into HR. I just spent the last two-and-a-half hours fucking defending myself. She just fucked herself up because I'm going to fucking fire her and then I'm going to fucking kill her two dogs because she fucking loves them so much."

112. On or around November 12, 2015, Defendant notified Plaintiff that her employment was being terminated as part of a "reduction in force."

113. The only other employee terminated as part of the alleged "reduction in force" was Lyke, then 62 years of age.

114. Defendant's articulated reason for terminating Plaintiff's employment was a pretext to engage in discrimination, reprisal, and retaliation.

115. As a result of Defendant's action, Plaintiff has suffered and will continue to suffer, lost wages and benefits, emotional and mental distress, and other damages.

## COUNT I
## REPRISAL IN VIOLATION OF
## THE MINNESOTA HUMAN RIGHTS ACT

116. Plaintiff realleges each and every paragraph of this Complaint.

117. Defendant by and through its managers and officials acting on behalf of Defendant and within the scope of their employment engaged in unlawful employment practices

involving Plaintiff in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.* These practices include, but are not limited to, retaliating against Plaintiff because she reported discrimination and retaliation in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.*

118.     The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affecting her status as an employee because she reported discrimination, harassment, and retaliation in the workplace.

119.     The unlawful employment practices complained of above were intentional and were performed by Defendant with malice and/or reckless indifference to the anti-retaliation laws that protect Plaintiff.

120.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, loss of reputation, loss of wages, and other serious damages.

**COUNT II**
**AGE DISCRIMINATION IN VIOLATION OF**
**THE MINNESOTA HUMAN RIGHTS ACT**

121.     Plaintiff realleges each and every paragraph of this Complaint.

122.     Defendant, by and through its managers and officials acting on behalf of Defendant and within the scope of their employment engaged in unlawful employment practices involving Plaintiff in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.* These practices include, but are not limited to, age discrimination in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.*

123.    The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affecting her status as an employee because of her age.

124.    The unlawful employment practices complained of above were intentional and were performed by Defendant with malice and/or reckless indifference to the anti-retaliation laws that protect Plaintiff.

125.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, loss of reputation, loss of wages, and other serious damages.

**COUNT III**
**AGE PLUS SEX DISCRIMINATION IN VIOLATION OF**
**THE MINNESOTA HUMAN RIGHTS ACT**

126.    Plaintiff realleges each and every paragraph of this Complaint.

127.    Defendant, by and through its managers and officials acting on behalf of Defendant and within the scope of their employment engaged in unlawful employment practices involving Plaintiff in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.* These practices include, but are not limited to, age plus sex discrimination in violation of the Minnesota Human Rights Act. Minn. Stat. § 363A.01 *et seq.*

128.    The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affecting her status as an employee because of her age and sex.

129.    The unlawful employment practices complained of above were intentional and were performed by Defendant with malice and/or reckless indifference to the anti-retaliation laws that protect Plaintiff.

130.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, loss of reputation, loss of wages, and other serious damages.

## COUNT IV
### DISABILITY DISCRIMINATION IN VIOLATION OF THE MINNESOTA HUMAN RIGHTS ACT

131.    Plaintiff realleges each and every paragraph of this Complaint.

132.    Defendant, by and through its managers and officials acting on behalf of Defendant and within the scope of their employment engaged in unlawful employment practices involving Plaintiff in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.* These practices include, but are not limited to, disability discrimination in violation of the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.*

133.    The effect of the practices complained of above has been to deprive Plaintiff of equal employment opportunity and otherwise adversely affecting her status as an employee because of her age.

134.    The unlawful employment practices complained of above were intentional and were performed by Defendant with malice and/or reckless indifference to the anti-retaliation laws that protect Plaintiff.

135.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, loss of reputation, loss of wages, and other serious damages.

## COUNT V
### INTERFERENCE IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT

136.    Plaintiff re-alleges each and every paragraph of this Complaint.

137.     Plaintiff sought a medical leave of absence under the Family and Medical Leave Act ("FMLA") on both a continuous and intermittent basis.

138.     Defendant by and through its managers and officials acting on behalf of Defendant and within the scope of their employment interfered with, restrained, or denied Plaintiff's rights provided to Plaintiff under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et seq.*

139.     To wit, Defendant failed to reinstate Plaintiff to the same or substantially similar position after her use of FMLA leave.  Similarly, Plaintiff was told by Defendant that certain absences would be protected by the FMLA, but were in fact used as a negative factor in employment decisions involving Plaintiff.

140.     The unlawful practices complained of were intentional and were performed by Defendant with malice and/or reckless indifference to the FMLA.

141.     As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, humiliation, embarrassment, loss of reputation, loss of wages, and other serious damages.

**COUNT VI**
**DISCRIMINATION IN VIOLATION OF**
**THE FAMILY AND MEDICAL LEAVE ACT**

142.     Plaintiff re-alleges each and every paragraph of this Complaint.

143.     Defendant by and through its managers and officials acting on behalf of Defendant and within the scope of their employment discriminated against Plaintiff due to Plaintiff exercising her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et seq.*

144. Defendant engaged in unlawful discriminatory employment practices in violation of the FMLA because Plaintiff exercised her statutory rights. These practices include, but are not limited to, terminating Plaintiff's employment with Defendant.

145. The unlawful employment practices complained of were intentional and were performed with malice and/or reckless indifference to the FMLA.

146. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer from emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of wages and benefits, and other serious damages.

## COUNT VII
### RETALIATION IN VIOLATION OF THE MINNESOTA WHISTLEBLOWER ACT

147. Plaintiff re-alleges each and every paragraph of this Complaint.

148. Plaintiff, in good faith, reported what she believed to be violations of state and federal laws, and rules adopted pursuant to law.

149. Defendant retaliated against Plaintiff for her reports of violations of law and/or regulations.

150. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and continues to suffer from emotional distress, humiliation, embarrassment, pain and suffering, loss of reputation, loss of wages and benefits, and other serious damages.

## COUNT VIII
### RETALIATION IN VIOLATION OF THE MINNESOTA WORKERS' COMPENSATION ACT

151. Plaintiff re-alleges each and every count of this Complaint.

152. The Minnesota Workers Compensation Act prohibits any person from discharging an employee for seeking workers' compensation benefits. Minn. Stat. § 176.82, subd. 1.

153.     Defendant discharged Plaintiff for seeking workers' compensation benefits in violation of Minnesota Statutes § 176.82, subd. 1.

154.     As a result of these unlawful actions, Plaintiff has suffered from lost wages and benefits, emotional and mental distress, and other damages.

**WHEREFORE,** Plaintiff respectfully prays:

a.      That Defendant's acts or omissions described in this Complaint constitute violations of applicable laws that protect Plaintiff;

b.      That Defendants and their employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries and all others persons acting in concert or participation with Defendants be enjoined from their unlawful acts;

c.      That Defendant be required to make Plaintiff whole for their adverse and retaliatory actions through restitution in the form of back pay, with interest of an appropriate inflation factor;

d.      That Plaintiff be awarded front pay and/or the monetary value of any employment benefits Plaintiff would have been entitled to as an employee of Defendants;

e.      That Plaintiff be awarded compensatory damages in an amount to be established at trial;

f.      That the Court award Plaintiff her attorneys' fees, costs, and disbursements pursuant to statute;

g.      That Plaintiff be awarded treble damages pursuant to the Minnesota Human Rights Act, Minn. Stat. § 363A.01 *et seq.*;

19

h.    That Plaintiff be awarded liquidated damages pursuant to the Family and

Medical Leave Act, 29 U.S.C. § 2611 *et seq.*;

i.    That Plaintiff be awarded punitive damages, as provided for by statute; and

j.    That the Court grant such other and further relief as it deems fair and

equitable.

## PLAINTIFF DEMANDS TRIAL BY JURY ON ALL COUNTS

Dated this 1st day of September 2016.            **LELAND LAW PLLC**

/s/ Daniel Gray Leland
Daniel Gray Leland, #389027
310 Fourth Avenue South, Suite 5010
Minneapolis, MN 55415
T/F: 612-206-3780
Email: leland@lelandlawoffice.com

## ACKOWLEDGMENT

The undersigned hereby acknowledges that costs, disbursements, and reasonable attorney's fees may be awarded pursuant to Minn. Stat. § 549.211 to the party against whom the allegations in this pleading are asserted.

Dated this 1st day of September, 2016.            /s/ Daniel Gray Leland
Daniel Gray Leland